ASOCIACIÓN DE EDUCACIÓN
PRIVADA DE PUERTO RICO,
INC., et al., Plaintiffs,

v.

Alejandro GARCIA PADILLA, Secretary
of the Department of Consumer Affairs of the Commonwealth of Puerto
Rico, Defendant.

No. CIV. 03–1213(HL).

United States District Court,
D. Puerto Rico.

Dec. 13, 2005.

Antonio J. Amadeo–Murga, A.J. Amadeo Murga Law Office, San Juan, PR, for Asociacion de Educacion Privada de Puerto Rico, Inc., Puerto Rico Innovatives Education Services, Inc. doing business as Colegio Tomas Alva Edison, Corporacion Educativa Ramon Barquin doing business as American Military Academy, Academia Inmaculada Concepcion–Mayaguez, Southwestern Educational Society, Inc., Guamani School, Inc., Colegio Adianez, Inc., Antilles Military Academy, Inc., Fundacion Educativa Concepcion Martin, Inc. doing business as Sonifel, Saint Francis School, Inc., American School, Inc., Plaintiffs.

Elfrick Mendez–Morales, Mendez & Mendez, San Juan, PR, Felix M. Roman–Carrasquillo, San Juan, PR, Lavinia Aparicio–Lopez, Commonwealth Department of Justice, Francisco A. Ojeda–Diez, P.R. Department of Justice—Federal Litigation, San Juan, PR, for Javier A. Echevarria–

Vargas, Alejandro Garcia–Padilla, Defendants.

## OPINION AND ORDER

LAFFITTE, District Judge.

Plaintiffs,[1] a nonprofit private association representing the interest of private primary, secondary, and post secondary member schools in Puerto Rico, along with individual schools, filed this action on March 3, 2003, against Javier A. Echevarría Vargas, the Secretary of the Department of Consumer Affairs of the Commonwealth of Puerto Rico (hereinafter "DACO" for its Spanish acronym),[2] pursuant to 42 U.S.C. § 1983 alleging that Rule 11[3] of DACO's Regulation 6458, Regulation for the Disclosure of Information on the Sale and Distribution of Textbooks ("*Reglamento para la Divulgación de In-*

*formación en la Venta y Distribución de Libros de Texto*") violates plaintiffs' First Amendment rights, specifically plaintiffs' rights to academic freedom and free speech.[4] On October 27, 2003, the Court dismissed plaintiffs' complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim.[5] On October 5, 2004, the Court of Appeals for the First Circuit reversed the dismissal because at that stage in the proceedings, without a developed factual record, the Court of Appeals could not conclude that there were no possible set of facts on which the Regulation as implemented would be unconstitutional. *Asociacion de Educacion Privada de Puerto Rico, Inc. v. Echevarria–Vargas*, 385 F.3d 81 (2004). Consequently, the case was remanded to this Court.[6]

1. The original plaintiffs in this action are: Asociación de Educación Privada de Puerto Rico, Inc.; Puerto Rico Innovatives Education Services, Inc., d/b/a Colegio Tomas Alva Edison; Corporación Educativa Ramón Barquin, d/b/a American Military Academy; Academia Inmaculada Concepción–Mayaguez; Southwestern Educational Society, Inc.; Guamaní School, Inc.; Colegio Adianez, Inc.; Antilles Military Academy, Inc.; Fundación Educativa Concepción Martín, Inc., d/b/a Sonifel; Saint Francis School, Inc.; and American School, Inc. (*See* docket no. 1). The following plaintiffs later intervened in this action: Academia Discípulos de Cristo; Academia Bautista de Puerto Nuevo; Coegio Rosabel; Episcopal Cathedral School; Colegio de La Vega; Colegio Titi Fe; Escuela Prescolar, Elemental e Intermedia Daskalos; Caguas Military Academy; Colegio Radians; Frederick Frobel Bilingual School; and Colegio Kiany; Fajardo Academy. (*See* docket nos. 46, 53).

2. At the time that this action was originally filed, Javier A. Echevarría Vargas was the Secretary of the Department of Consumer Affairs of the Commonwealth of Puerto Rico (DACO). However, Alejandro Garcia Padilla has succeeded Echevarría Vargas as Secretary of the DACO, and thus has substituted Echevarría Vargas as defendant in the present

action. *See Maria Santiago v. Corporacion De Renovacion Urbana Y Vivienda De Puerto Rico*, 554 F.2d 1210, 1213 (1st Cir.1977); Fed.R.Civ.P. 25(d). ("If officers sued in an official capacity leave office during the pendency of an action, their successors are automatically substituted. Fed.R.Civ.P. 25(d). Once an injunction is entered, those who succeed the named parties succeed as well to the duties imposed on their predecessor by decree; any other result would undermine the strong policy in favor of enforcing federal law, a policy that originally impelled the courts to create the fictional distinction between officer and government.")

3. Rule 11 of Regulation 6458 provides that private schools must inform parents on a book list whether any new edition of a textbook slated for use in the following academic year contains significant changes; what the specific changes consist of, if any; and if the changes are not significant, that the parents have the option of buying the previous edition of the textbook. *See* Reg. 6458, R. 11.

4. *See* docket no. 1.

5. *See* docket no. 9.

6. *See* docket 15.

Defendant answered the complaint on March 16, 2005, and on March 21, 2005, the Court entered an initial scheduling order which, *inter alia*, ordered the parties to submit pretrial briefs addressing which First Amendment rights are implicated by the Regulation, if any; the nature and weight of the burden, if any, imposed on plaintiffs; and the strength of the government's justifications for imposing the burden, if any.[7] Plaintiffs subsequently filed a motion to amend the complaint to add a cause of action challenging the constitutionality of the Commonwealth of Puerto Rico's Law 116[8] of May 18, 2004 ("Law 116"), entitled Law for the Acquisition of School Textbooks ("*Ley para la Compra de Libros de Textos Escolares* ").[9] The Court granted plaintiffs' unopposed motion to amend the complaint, and the amended complaint was filed on June 7, 2005.[10] The amended complaint alleges that DACO's Regulation 6458 and the Commonwealth of Puerto Rico's Law 116 violates plaintiffs' First Amendment rights to academic freedom and free speech. Plaintiffs seek declaratory and injunctive relief, as well as costs and attorneys' fees. A bench trial[11] was held on November 7, 2005.

## FINDINGS OF FACT

This case was tried before the Court on November 7, 2005. Having considered the evidence, and the parties' pretrial briefs, the Court is now ready to rule.

7. *See* docket nos. 19, 21.

8. Law 116 provides that private schools must hold an assembly wherein an association, council, or assembly of parents shall approve the textbook budget applicable to each grade for the following school year. *See* Law 116, Arts. III–VI.

9. *See* docket no. 28.

10. *See* docket no. 37.

1. In the present action the term "textbooks" is defined broadly. Law 116 defines school textbooks as "every text, dictionary, reference textbooks [sic], handbook, pamphlet, or material for study required or suggested by any private school for the use of the academic or curricular program." Law 116, Art. II(c).

2. Regulation 6458 defines school books as "all textbooks dictionaries, reference books, handbooks, pamphlets, or study materials required or suggested by a school for the use of their academic programs and/or curricula." Reg. 6458, R. 4(H).

3. Textbooks are widely used in private primary and secondary schools in Puerto Rico. Textbooks comprise more than their bound volumes alone, textbooks are often accompanied by resource kits which include audio and visual multimedia materials, such as audio cassettes, CD–ROMs, DVDs, floppy disks, and transparencies.

4. Textbooks frequently have related workbooks. These workbooks are usually textbook edition specific. Workbooks are often used for lesson enforcement, preparation, or extra-practice in correlation with a specific in-class lesson.

5. Textbooks are an essential pedagogical tool employed daily in classrooms to deliver the substantive content of educational lessons.

6. Textbooks are an integral part of curriculum and lesson plan development.

11. Plaintiffs had asserted a jury demand in the amended complaint. (Docket no. 37). Plaintiffs later withdrew the jury demand and waived their right to a jury trial. (Docket no. 56). Prior to commencement of the bench trial, in open court and on the record, the parties confirmed that they were in agreement and had no objection that the action be heard as a bench trial rather than a jury trial. *See* Fed.R.Civ.P. 39(a).

The development of lesson plans by teachers takes a considerable amount of time. In developing lesson plans, teachers rely heavily on their selected textbooks and the syllabi presented in the textbooks because these materials provide the basis of the content that will be discussed in a class lesson.

7. Textbooks are selected by private schools to be aligned with the school's particular vision, mission, philosophy, curriculum, and methodology. The academic and educational visions, missions, philosophies, curricula, and methodologies of private schools in Puerto Rico vary broadly.

8. A private school may choose to adopt a new edition of a textbook or new textbook series for several reasons, including significant developments in an educational field, the introduction of a new pedagogical approach, or due to the lack of availability of the textbook previously used by the school.

9. Publishing houses impart information about their new textbook series or editions to private schools through conferences; telephone calls; and direct mailings of brochures, sample textbooks, and educational kits.

10. Textbook publishers change the edition of a textbook approximately every two to six years. Certain substantive areas are apt to change more frequently than others. For instance, new editions of Science textbooks may be introduced by publishers every two or three years, while English textbook editions usually change only every five or six years. The amount of notice provided by publishers when a new textbook edition is introduced into the market varies generally from one year to a couple of months before the new academic year begins in August.

11. The process by which private schools select new textbooks is school specific. The schools evaluate a new edition or series first and foremost on the grounds of whether the textbook is aligned with the school's curriculum, mission, vision, philosophy, methodology; and whether it meets the school's students' needs. Teachers input in this process his highly valued by the schools. Teachers often make an independent evaluation of the textbook series or edition on the above mentioned criteria. After an initial independent evaluation by individual teachers, the teachers often meet as a group on multiple occasions to determine whether the series or edition meets the aforementioned criteria. Teachers' input is generally shared with school administrators, such as the school director and program coordinators who review the teachers' conclusions, with or without making their own independent assessment of the textbooks. Some schools may employ external consultants with expertise in certain substantive areas to advise teachers or administrators on new textbooks or pedagogical methods.

12. Parental participation in selecting textbooks in private schools is typically nonexistent or minimal. At some private schools parents may act as a general sounding board or advisory group, but the ultimate decision of which books are selected resides with the private schools.

13. In selecting new textbook editions or series, the primary factor is whether the textbook best meets the particular private school's curriculum, mission, vision, philosophy, methodology, as well as the schools' students' ever-changing educational and developmental needs. However, secondarily, the schools also consider the price and availability of the textbooks. Schools are concerned that the textbooks be widely available at stores in a diversity of locations.

14. Private schools do not generally change the editions or series of textbooks

for all subject areas at once. For instance, at Tomas Alva Edison School, the school selects approximately two subjects per year and evaluates textbooks for only these subject areas.

15. After selecting the textbooks to be used in the upcoming academic year, the private schools create a book list which is provided to parents no later than May 15th or three months prior to the academic year if said year begins in a month other than August. The resale of textbooks by students to other students is a common practice, but varies by school.

16. Tomas Alva Edison School is a private secular school located in Caguas, Puerto Rico, which provides education to 700 students, ages two through eighteen. This academic year at Alva Edison School, a ninth grade Social Studies teacher decided not to elect the new edition of a certain Social Studies textbook. The teacher and the school believed that the old textbook edition was sufficient and that the changes between the old edition and new edition were not significant. The old textbook edition was out of print. Despite the teacher's and school administration's effort to promote the resale of used old edition textbooks, approximately five students were unable to procure the old edition. These approximately five students purchased the new edition. Consequently, both the old edition and the new edition of the textbooks were used in the same classroom. The pagination of the two editions for the same content varied. Using two editions of the same textbook created disruption in the classroom and classroom management problems. Due to the shortage of the old edition textbook, the teacher had to sometimes utilize cooperative groups for the lessons although the teach-

er and school administrators did not feel that the subject matter should be taught in such a manner.

17. Ana Christina Sanchez is the school director of Colegio Adianez, a private secular primary and secondary school comprised of 780 students located in Guaynabo, Puerto Rico, and the president of the private schools association. Ms. Sanchez previously worked as a teacher at Colegio Adianez from 1983–1993, where she taught Literature, Spanish, Social Studies, and Science. While she was teaching Spanish, circa 1990, she had the experience of students using two editions of a textbook in the same class. Ms. Sanchez did not think that the changes between the editions were significant. Ms. Sanchez found that having two editions of the same textbook was disruptive in the classroom, primarily because the same material appeared on different pages. She found it was difficult to maintain the students' attention, and a classroom management problem developed. After a few weeks, all the children were required to purchase and use only the new edition of the textbook.

18. Noema Giralt–Armada is the Director of the San Juan Region of DACO. Ms. Giralt–Armada has worked for DACO in numerous capacities, including administrative judge, Director of the Examining Officers' Division, Deputy Secretary, and acting interim Secretary. Ms. Giralt–Armada was involved in the development and enactment of Regulation 6458 (including the challenged provision "Rule 11") and its predecessor, Regulation 4635.[12] Ms. Giralt–Armada also worked as a teacher at San Jose School in Caguas, Puerto Rico from 1980–1988, where she taught History, Science, and Mathematics. At some point while teaching, due to the late arrival of

12. DACO's Regulation 4635 was enacted in 1992 and was substantively similar to DACO's Regulation 6458, except it did not contain the provisions provided in Regulation 6458's Rule 11. See Reg. 4635.

the new edition of a textbook, students were allowed to use two editions of a textbook in a class. The textbook was her tool to teach a skill, and she found that this could not be achieved if she did not control her student group. Ms. Giralt–Armada believes that her teaching objectives could only be achieved by issuing clear instructions to students.[13]

19. Any natural or legal person who violates Rule 11 of Regulation 6458 may be liable of a fine of no more than $10,000.00. DACO has issued forty-nine (49) notices of violation of Regulation 6458. Of these forty-nine notices, six fines in the amount of $200.00 have been paid.

20. DACO has issued notices to private schools inquiring whether the schools have complied with Law 116. Failure to comply with DACO's information requests may result in the imposition of fines. DACO has fined some private schools for failing to comply with Law 116.

## DISCUSSION

"Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us," and is a "special concern of the First Amendment." *Keyishian v. Bd. of Regents of the Univ. of the State of New York,* 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *United States v. Amer. Library Ass'n, Inc.,* 539 U.S. 194, 226, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003). The term academic freedom is equivocal and encompasses both the freedom of educational institutions to pursue their ends without interference from the government and the freedom of individual teachers to pursue its ends without interference from their educational institutions. *See Piarowski v. Ill. Cmty. Coll. Dist. 515,* 759 F.2d 625, 629 (1985) (citing *Regents of*

*the Univ. of California v. Bakke,* 438 U.S. 265, 312, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978)). In the present case, the variant of academic freedom implicated is the former, the right of educational institutions -specifically primary and secondary private schools- to pursue their educational ends without interference from the government.

"Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also ... on autonomous decisionmaking by the academy itself." *Regents of Univ. of Michigan v. Ewing,* 474 U.S. 214, 226 n. 12, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (internal citations omitted) (citing *Keyishian,* 385 U.S. at 603, 87 S.Ct. 675; *Sweezy v. New Hampshire,* 354 U.S. 234, 262, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); *Bakke,* 438 U.S. at 312, 98 S.Ct. 2733); *Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth,* 529 U.S. 217, 237, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000). *See generally,* Todd A. DeMitchell, *Academic FreedomWhose Rights: The Professor's or the University's,* 168 Ed. Law. Rep. 1 (2002). Academic freedom is based upon "the exclusion of governmental intervention in the intellectual life" of the educational institution. *Sweezy,* 354 U.S. at 262, 77 S.Ct. 1203 (Frankfurter, J., concurring). "[A]cademic freedom has included not merely liberty from restraints on thought, expression, association in the academy, but also the idea that universities and schools should have the freedom to make decisions about *how* and *what* to teach." *Bd. of Regents of Univ. of Wisconsin Sys.,* 529 U.S. at 237, 120 S.Ct. 1346; *id.* (emphasis ours).[14]

Academic freedom "includes the interest of educational institutions, public as well as private, in controlling their own destiny

---

**13.** The testimony of Giralt–Armada does not carry enough weight when compared with the weighty, credible, and uncontested testimony of Dr. Rafael Cartagena. Further, her testimony was mainly based upon hearsay information.

**14.** *See* J. Peter Byrne, *Academic Freedom: A "Special Concern of the First Amendment",* 99

and thus in freedom from intrusive judicial [and governmental] regulation." *Crowley v. McKinney,* 400 F.3d 965, 969 (7th Cir. 2005) (citing *Grutter v. Bollinger,* 539 U.S. 306, 324, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003); *Keyishian,* 385 U.S. at 603, 87 S.Ct. 675; *Chicago Bd. of Educ. v. Substance, Inc.,* 354 F.3d 624, 630–31 (7th Cir.2003); *Osteen v. Henley,* 13 F.3d 221, 225–26 (7th Cir.1993); *Bickerstaff v. Vassar College,* 196 F.3d 435, 455–56 (2d Cir. 1999); *EEOC v. Amego, Inc.,* 110 F.3d 135, 145 (1st Cir.1997)). More specifically, academic freedom is the right of educational institutions to be free from governmental interference in the performance of core educational functions. *See* J. Peter Byrne, *Academic Freedom: A "Special Concern of the First Amendment,"* 99 Yale L.J. 251, 311 (1989). Core educational functions include the "four freedoms," identified by Justice Frankfurter in *Sweezy,* "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Sweezy,* 354 U.S. at 263, 77 S.Ct. 1203. Furthermore, as it has been oft noted by the United States Supreme Court and the Court of Appeals for the First Circuit, " '[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.' " *Id.* (quoting *Shelton v. Tucker,* 364 U.S. 479, 487, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960)); *New Rider v. Bd. of Educ. of Indep. Sch. Dist. No. 1, Pawnee County,*

*Oklahoma,* 414 U.S. 1097, 1100, 94 S.Ct. 733, 38 L.Ed.2d 556 (1973); *Healy v. James,* 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Asociacion de Educacion Privada de Puerto Rico, Inc.,* 385 F.3d at 89 (Torruella dissenting); *Alinovi v. Worcester Sch. Comm.,* 777 F.2d 776, 789 (1st Cir.1985); *Cuesnongle v. Ramos,* 713 F.2d 881, 884 (1st Cir.1983); *Gay Students Org. of Univ. of New Hampshire v. Bonner,* 509 F.2d 652, 658 (1st Cir.1974).[15]

In the instant case, plaintiffs (a nonprofit private association representing the interest of private primary, secondary, and post secondary member schools in Puerto Rico, along with individual private schools) claim that DACO's Rule 11 [16] of Regulation 6458, entitled Regulation for the Disclosure of Information on the Sale and Distribution of Textbooks (*"Reglamento para la Divulgación de Información en la Venta y Distribución de Libros de Texto "*) (hereinafter "Regulation 6458") and the Commonwealth of Puerto Rico's Law 116 of May 18, 2004, entitled Law for the Acquisition of School Textbooks (*"Ley para la Compra de Libros de Textos Escolares "*) (hereinafter "Law 116") violate their First Amendment rights to free speech and academic freedom.

## I.

### DACO Regulation 6458

The Department of Consumer Affairs of the Commonwealth of Puerto Rico

---

Yale L.J. 251, 311–340 (1989) (for an extensive discussion of constitutional academic freedom and the protection of institutional autonomy).

**15.** Although the majority of academic freedom challenges have arisen in the context of higher education, it is well settled that the First Amendment right to academic freedom provides protection for primary and secondary schools and teachers. *See e.g., Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Epperson v. Arkansas,* 393 U.S.

97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (Arkansas statute forbidding any teacher to teach evolution struck down as unconstitutional); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (State law prohibiting the teaching of foreign languages in public school found unconstitutional because no legitimate state interest justified the regulation).

**16.** Rule 11 is the only provision of Regulation 6458 that plaintiffs challenge. Therefore, the constitutionality of the other provisions of Regulation 6458 is not before the Court.

("DACO" for its Spanish acronym) promulgated Regulation 6458 in 2002. The purported general objectives of the Regulation are to protect Puerto Rican parents and guardians who register their minor children or wards in private schools in Puerto Rico and to "define the obligations and responsibilities of schools, bookstores, distributors, and publishing houses in relation to the corresponding process pertaining to the sale of textbooks." Reg. 6458, R. 2. "The Regulation imposes several obligations on schools. Rule 8 directs a school to announce, by May 15 of the current school year, what books will be used the following school year. *Id.* R. 8(A). Rule 9 specifies that schools must disclose final sales prices for the books and the agreement with the book seller. *Id.* R. 9(A). Rule 10 requires the schools to inform parents of price changes. *Id.* R. 10. . . . Rule 12 requires schools to disclose to parents the existence and applicability of the Regulation *Id.* R. 12." *Asociacion de Educacion Privada de Puerto Rico, Inc.,* 385 F.3d, at 83–84.

The specific provision of Regulation 6458 that plaintiffs challenge is Rule 11, which provides: "[i]n the case which there are changes in the edition, the school will inform in the book list which of these books have different editions, what the change specifically consists of, and whether it is a significant change or not, as defined by these regulations. In case that the changes are not significant, the school has to inform the parents on [sic] said list, that they have the option of buying the previous edition." Reg. 6458, R. 11. "A significant change" is defined by Rule 4(A) as "historical, technological, scientific and/or cultural changes integrated in the new edition of a book that are significant and as such cause the total or partial revision of one or several chapters or sections and/or the inclusion of one or sever chapters or sections." *Id.* R. 4(A). However, "[t]he exclusion of chapters or sections, cosmetic changes and/or style, such as cover changes, chapter or section order, book texture and/or material does *not* constitute a significant change. Additions of one or several sentences to one chapter or section or through a new book edition will not be considered a significant change nor the addition of one or several drawings, graphics, tables, or photos." *Id.* The regulation does not set forth any procedure for resolving disputes between DACO and a private school over whether a new edition contains a "significant change." [17]

Plaintiffs allege that Rule 11 of Regulation 6458 violates their First Amendment rights to free speech and academic freedom because it restricts private schools' freedom to decide what to teach and the manner that their curriculum is taught. Plaintiffs argue that Rule 11 places restrictions on what private schools teach because the regulation grants the Secretary of DACO the power to determine when a new edition of a textbook contains or does not contain a "significant" change from the prior edition. Plaintiffs argue that consequently, private schools are divested of their autonomy to select textbook materials and that said power is bestowed upon an institutional officer, the Secretary of DACO, who lacks any pedagogical or educational expertise. Plaintiffs contend that

---

**17.** Noema Giralt–Armada, the Director of the San Juan Region of DACO and former acting interim Secretary of DACO, testified that DACO had started communication with the Department of Education of the Commonwealth of Puerto Rico regarding the formation of a panel to provide the Secretary of DACO with knowledge to determine what constitutes a "significant change" in diverse educational subject areas, but that this effort ceased after the change of administrations. There is no indication that the institution of such a panel will be pursued in the future.

the Secretary of DACO and the agency itself are not qualified to make the ultimate decision of what constitutes a "technological, scientific, or cultural change" in diverse academic disciplines. Plaintiffs further argue that what may be considered an insignificant change in a new edition of a textbook by the Secretary of DACO, might represent a significant and important change according to an individual private school's academic philosophy, mission, and methodology.

Plaintiffs also argue that the provision of Rule 11 which grants parents the option of purchasing only the previous edition of a textbook if the changes in the new edition are not deemed "significant," imposes restrictions on the manner or method that private schools teach their students. If the school or DACO deems the changes in the new edition textbook to be "not significant," parents may exercise a new founded right to purchase only the old edition of the text. This could foreseeably result in some students using the old edition of the textbook while others use the new edition. Under the Regulation the exclusion of chapters or sections; changes in chapter or section order; addition of several sentences to a chapter or section; and the addition of several drawings, graphics, tables, or photos do not constitute a "significant change" in the new edition of a textbook. Reg. 6458, R. 4(A). Plaintiffs allege that using two editions of a textbook with different pagination will result in serious class management problems, disruption in the educational environment, and that teachers will have the time-intensive burden of developing two sets of lesson plans for each course. Plaintiffs argue that this scheme forces schools to employ teaching methods, such as cooperative work groups, that the schools find to be less effective or inappropriate for the subject matter. Plaintiffs also allege that

the use of two textbook editions can have a negative impact on students' self-esteem and confidence if they cannot follow the lesson due to pagination differentiations or are teased by other students for using the old edition of a text. Plaintiffs further claim that primary and secondary school students learn effectively through the use of visual information, and that the private schools' ability to use drawings, graphics, tables, or photographs - which the school · considers pedagogically important and only appear in the new edition of a textbook will be severely impeded if students have the option to purchase · only the old edition of a textbook that does not ·contain these visual materials.

Plaintiffs' final argument is that Rule 11 has a chilling effect on private schools' speech and academic freedom. Plaintiffs argue that a private school may choose not to select a new edition of a desirable textbook simply for fear that the Secretary of DACO may not consider that the edition is significantly different from the prior edition because (1) the Regulation does not provide an administrative appeals process, and the private schools may fear risking a costly or lengthy appeal to the courts; and (2) the schools may be concerned about the risk of being forced to utilize two editions of a textbook in the classroom.

The Court finds that Rule 11 of Regulation 6458 imposes restraints on plaintiffs' First Amendment rights of free speech and, even more pointedly, academic freedom. Private schools in Puerto Rico are diverse in their missions and philosophies. Some schools have a religious or military orientation, while others base their mission in college preparation or alternative teaching methods. One commonality between these diverse educational institutions is the widespread use of textbooks, which are an essential pedagogical tool in these schools.

Textbooks[18] -and their accompanying or related resources, such as syllabi; teacher-edition textbooks; workbooks; CD–ROMs, DVDs, or floppy disks; and resource kits containing a variety of other audio, visual, and multi-media materials are selected to be aligned with the individual private school's particular mission, philosophy, teaching methodology, and curriculum. Teachers at private schools rely heavily on textbooks to create their individualized course syllabi and daily lesson plans. Teachers also rely on textbooks to prepare student assessments, such as examinations. Textbooks are employed as the primary method to convey the substantive content of lessons to students and to impart or strengthen new skills. Textbooks are widely used in the classroom, as well as for student extra-practice, lesson preparation or review, assessment preparation, remediation, enrichment, and homework assignments.

█ In essence, textbooks and their associated materials encompass the content of *what* is taught in private schools in Puerto Rico and are intrinsically linked to the method or *how* that content is taught. It is well settled that the core educational functions protected by the First Amendment right to academic freedom include the freedom of a school "to determine for itself on academic grounds ... *what* may be taught [and] *how* it shall be taught." *See Sweezy,* 354 U.S. at 263, 77 S.Ct. 1203 (emphasis ours); *Bd. of Regents of Univ. of Wisconsin Sys.,* 529 U.S. at 237, 120 S.Ct. 1346 (Academic freedom includes "the idea that universities and schools should have the freedom to make decisions about how and what to teach."). Rule 11 imposes obligations which restrict private schools' ability to determine what shall be taught and how the curriculum shall be taught in some instances when a school selects a new edition of a textbook. Most notably, by allowing parents to purchase the old edition of a textbook when the school or DACO determines that the changes between the editions are "not significant" under the Regulation, Rule 11 effectively provides for the use of two editions of a textbook in the same class irrespective of whether this contravenes the private school's chosen teaching methods.[19] Requiring the use of two textbook editions will be highly burdensome to private schools and their teachers who will have to draft two different sets of lesson plans for each course; contend with resultant class management problems and disruptions; and employ teaching methods that the schools and teachers do not find effective or do not want to utilize.

Rule 11 of Regulation 6458 also interferes with "*what* may be taught" in private schools. *See Sweezy,* 354 U.S. at 263, 77 S.Ct. 1203; *Bd. of Regents of Univ. of Wisconsin Sys.,* 529 U.S. at 237, 120 S.Ct. 1346. For instance, a private school might select a new textbook because it contains the addition of certain drawings, graphics, tables, or photographs that were absent from the former edition and which the school finds important to the education of its students and execution of the particular school's philosophy, methodology, or mission. Under Regulation 6458 the addition of drawings, graphics, tables, or photo-

18. Regulation 6458 defines the term "books" broadly to include "all textbooks, dictionaries, reference books, handbooks, pamphlets, or study materials required or suggested by a school for the use of their academic programs and/or curricula." Reg. 6458, R. 4(H).

19. Alternatively, if the old edition of a textbook remained available and all parents or guardians elected to exercise their new-founded right under Rule 11 to purchase only the old edition, a school's decision to use the new edition of a textbook could be wholly frustrated.

graphs does not constitute a "significant change" between textbook editions. *See* Reg. 6458, R. 4(A). Thus, Rule 11 permits parents to purchase only the old edition of the textbook which does not contain the new visual materials. *Id.* R. 11. This would greatly curtail or, in circumstances where the visual information is not available elsewhere or for reproduction, even prevent private schools from teaching the subject matter contained in the new edition of the textbook.

Under the Regulation a historical, technological, scientific, or cultural change is deemed a "significant change" only if it causes the total or partial revision or inclusion of one or several chapters or sections. *Id.* R. 4(A). The "addition[ ] of one or several sentences to one chapter or section or through[out] a new book edition will not be considered a significant change." *Id.* The exclusion of chapters or sections is also not considered a significant change. *Id.* However, the inclusion or exclusion of one or several sentences in a new edition of a textbook might be considered a significant change by a private school, making the use of the new edition of the textbook important to the accomplishment of the school's academic philosophy or mission. For example, as plaintiffs' expert witness

Dr. Rafael Cartagena [20] testified at trial, the inclusion or exclusion of even two words, such as "intelligent design" [21] in a new edition of a Science textbook may constitute a significant change to a private school, making the use of the new edition highly desirable or undesirable to that school. The addition or exclusion of a sentence in a new edition of a textbook stating that, "Evolutionary theory should be critically evaluated against other origin theories," could be imperative to a given private school's academic philosophy. A private school, religious [22] or secular, that supports teaching creationism or alternative origin theories might find that the evolution disclaimer is necessary to achieve that end. Conversely, a private school who wishes to exclusively teach evolution theory might find that the inclusion of a evolution disclaimer undermines the school's philosophy, and conclude that they want to adopt the new edition of a textbook that has excluded the disclaimer.

Origin theory is simply one poignant example of an area where an individual private school and DACO's determination of whether a new edition contains a definition is prone to dissension. Determining what constitutes a significant change between textbook editions in each field of-

---

20. Dr. Rafael Cartagena holds a doctorate in Educational Leadership and masters degrees in Philosophy and Theology. Dr. Cartagena is a former Secretary of Education for the Commonwealth of Puerto Rico. He has served as the dean of academic affairs and chancellor of Inter–American University, as well as chancellor of the University of Turabo. Dr. Cartagena is the founder and president of Elemental e Intermedia Daskalos, an alternative private school located in Cupey, Puerto Rico. Dr. Cartagena also currently serves as an educational analyst for PBS Puerto Rico.

21. "Intelligent design" refers to the theory that Darwinian evolution is based on inaccurate assumptions and evidence that is inappropriately biased against proof of supernatu-

ral intervention in the evolutionary process. *See* George P. Smith, *Law, Medicine, and Religion: Towards a Dialogue and a Partnership in Biomedical technology and decision making,* 21 J. Contemp. Health L. & Pol'y 169, 188–189 (2005). *See also*, David K. DeWolf, et al., *Teaching the Origins Controversy: Science, or Religion, or Speech?,* 2000 Utah L.Rev 39, 59–61 (2000).

22. Plaintiffs include religiously affiliated private schools. Plaintiffs have not raised a freedom of religion claim, and thus this issue is not before the Court. The Court notes however that Regulation 6458 restrictions may implicate heightened First Amendment concerns when applied to religious private schools.

fered at private schools in Puerto Rico— from History, Art, Culture, Social Studies, Science, Language, Literature, and others requires expertise in both the substantive field and pedagogy, as well an understanding of the particular private school's educational vision, mission, philosophy, curriculum, and methodology. This type of decision-making requires expert evaluation that is simply not within the competence or expertise of DACO.

Rule 11 interferes with "autonomous decisionmaking" by private schools and intrudes upon private schools' freedom to pursue their academic objectives without interference from the government. *See Piarowski,* 759 F.2d at 629 (citing *Bakke,* 438 U.S. at 312, 98 S.Ct. 2733) (Academic freedom denotes "the freedom of the academy to pursue its ends without interference from the government."); *Ewing,* 474 U.S. at 226 n. 12, 106 S.Ct. 507 (citing *Keyishian,* 385 U.S. at 603, 87 S.Ct. 675; *Sweezy,* 354 U.S. at 250, 77 S.Ct. 1203) ("Academic freedom thrives . . . on autonomous decisionmaking by the academy itself."); *Sweezy,* 354 U.S. at 262, 77 S.Ct. 1203 (Academic freedom is based upon "the exclusion of governmental intervention in the intellectual life" of the school);

*Crowley,* 400 F.3d at 969 (Academic freedom "includes the interest of educational institutions, public as well as private, in controlling their own destiny and thus in freedom from intrusive judicial [and governmental] regulation.") (citing *Grutter,* 539 U.S. at 324, 123 S.Ct. 2325; *Keyishian,* 385 U.S. at 603, 87 S.Ct. 675; *Chicago Bd. of Educ.,* 354 F.3d at 630–31; *Osteen,* 13 F.3d at 225–26; *Bickerstaff,* 196 F.3d at 455–56; *Amego, Inc.,* 110 F.3d at 145.).

■ Although Rule 11 of Regulation 6458 impairs private schools' First Amendment rights to free speech and academic freedom, it could still be valid if it survives constitutional scrutiny. In their pretrial brief plaintiffs did not specify what standard of review the Court should employ in its analysis of the constitutionality of Rule 11 of Regulation 6458.[23] Defendant, however, argues in his pretrial brief that intermediate scrutiny should apply.[24] The Court agrees.[25] Content-based restrictions, such as subject-matter or viewpoint restrictions, on speech must generally meet strict scrutiny. *See Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.,* 502 U.S. 105, 116, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991)(quoting *Regan v. Time, Inc.,* 468 U.S. 641, 648–49,

**23.** *See* docket no. 50. Plaintiffs' only reference to the issue of judicial scrutiny is contained in a quoted excerpt from *Circle School v. Phillips,* 270 F.Supp.2d 616 (E.D.Pa.2003). *Id.* at 4. *Circle School* is inapplicable in the present case because, unlike the case at hand, the challenged statute in *Circle School* constituted a viewpoint-based restriction on speech. *See Circle School v. Phillips,* 270 F.Supp.2d 616 (E.D.Pa.2003).

**24.** *See* docket no. 51, at 10 ¶ 6.1.

**25.** "Because academic freedom rights must ultimately flow from the First Amendment, claims of their violation are subject to all the usual tests that apply to assertions of First Amendment rights." *Omosegbon v. Wells,* 335 F.3d 668, 677–78 (7th Cir.2003). "The Supreme Court and other courts have re-

peatedly recognized institutional academic freedom, which is grounded in the Free Speech Clause of the First Amendment... [Educational institutions] are formed for the purposes of educating students and advancing and communicating knowledge, and therefore, the Free Speech Clause protects them from governmental interference in academic matters." James D. Gordon III, *Individual & Institutional Academic Freedom at Religious Colleges,* 30 J.Coll. & Univ. L. 1 (2003) (citing *Grutter v. Bollinger,* 539 U.S. 306, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003)); Mark. G. Yudof, *Three Faces of Academic Freedom,* 32 Loyola L.Rev. 831, 852–53 (1987)("[I]nstitutional academic freedom protects the private school from an overreaching government authority").

104 S.Ct. 3262, 82 L.Ed.2d 487 (1984)) ("Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment.'"); *Boos v. Barry,* 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988); *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 230, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987) (Content-based regulations are subject to strict scrutiny and require the government to show that the challenged regulations "are necessary to serve a compelling state interest and [are] narrowly drawn to achieve this end."); *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

■ Conversely, regulations are content neutral where they are intended to serve purposes unrelated to content of regulated speech, despite their incidental effects on the speech, expression, or message. *Simon & Schuster, Inc.,* 502 U.S. at 122, n. *, 112 S.Ct. 501; *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). Content neutral regulations are subject to intermediate scrutiny. *Bartnicki v. Vopper,* 532 U.S. 514, 545, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001). It is well settled that the "government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication.'" *Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton.* 536 U.S. 150, 177, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002) (quoting *Ward,* 491 U.S. at 791, 109 S.Ct. 2746) (quoting *Clark v. Cmty. for Creative Non–Violence,* 468

U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)). "A regulation is narrowly tailored if 'the means chosen are not substantially broader than necessary to achieve the government's interest." *Bl(a)ck Tea Sc'y v. City of Boston,* 378 F.3d 8, 12 (1st Cir.2004) (quoting *Ward,* 491 U.S. at 791, 109 S.Ct. 2746). "To satisfy this benchmark, a regulation need not be the least restrictive alternative available to the government." *Id.* (quoting *Ward,* 491 U.S. at 798–99, 109 S.Ct. 2746). In other words, "content-neutral regulations are not 'invalid simply because there is some imaginable alternative that might be less burdensome on speech.'" *Turner Broad. System, Inc. v. F.C.C.,* 520 U.S. 180, 217, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (quoting *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)).

■ "Deciding whether a particular regulation is content based or content neutral is not always a simple task." *Turner Broad. System, Inc. v. F.C.C.,* 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). "The principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of a disagreement with the message it conveys." *Ward,* 491 U.S. at 791, 109 S.Ct. 2746 (citing *Clark,* 468 U.S. at 295, 104 S.Ct. 3065). In the present case plaintiffs do not even argue that Regulation 6458 constitutes a content based restriction on speech or expression. There is no indication that Rule 11 of Regulation 6458 was adopted because of a disagreement with any message that may be conveyed in private schools' textbooks. *Id.* On its face, Regulation 6458 simply does not impose any restriction based upon subject matter or viewpoint. It does not "effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc.,* 502 U.S. at 116, 112 S.Ct. 501. Rather, Rule 11 of Regulation 6458

imposes limitations on the manner in which private schools educate their pupils. "As the concerns motivating strict scrutiny are absent, these content-neutral restrictions upon speech need pass only intermediate scrutiny." *Bartnicki*, 532 U.S. at 545, 121 S.Ct. 1753.

■ Accordingly, the Regulation 6458 will be upheld only if it is narrowly tailored to serve a significant governmental interest and leaves open ample alternative channels of communication. *Casey v. City of Newport, R.I.*, 308 F.3d 106, 110 (1st Cir.2002) (quoting *Ward*, 491 U.S. at 791, 109 S.Ct. 2746). The burden of proof is on the government to demonstrate that its restrictions on speech are narrowly tailored. *Id.; Bd. of Trustees v. Fox*, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). DACO purports that Regulation 6458 is aimed at the following two interests: (1) to provide consumers with information about textbooks so they can make an informed decision about the price of education in private schools; and (2) to protect consumers from the arbitrary or abusive use of new editions of textbook that only contain cosmetic changes.

DACO's primary goal of the Regulation is to provide consumers with information about textbooks so that consumers can make informed decisions about the price of education in private schools. At trial, defendant Javier Garcia Padilla, the Secretary of DACO, and his only other witness, Noema Giralt–Armada, the current Director of the San Juan DACO office and former acting interim Secretary of DACO who participated in the promulgation of Regulation 6458 and its predecessor, repeatedly emphasized that the only purpose of Rule 11 is to provide information to consumers. The Court agrees that DACO has a significant interest in providing consumers with information about the costs of goods such as textbooks and services such

as private school education. However, the Court finds that Regulation 6458 is not narrowly tailored because the means by which DACO has attempted to achieve its interest are substantially broader than necessary to accomplish the agency's purported objective.

First, the unchallenged provisions of Regulation 6458 already provide consumers with sufficient information about textbooks so that parents can make an informed decision about the price of education in private schools. The only provision of Regulation 6458 that plaintiffs challenge is Rule 11. The unchallenged provisions of the Regulation already require a wealth of advance notice requirements concerning identifying information about the books to be purchased and their prices. These unchallenged provisions of Regulation 6458 provide sufficient information to allow parents or guardians to shop and compare among private schools to determine which private school best meets their children's or wards' educational needs, as well as the needs of the parent or guardian's pocketbook. If none of the private schools present an appealing textbook budget, parents or guardians can choose to expend nothing on textbooks and enroll their children in the commonwealth's public schools.

Second, assuming that DACO has a significant interest in providing information to consumers specifically about whether a new edition of a textbook contains a significant change from a former edition, DACO has failed to demonstrate that Rule 11 is narrowly tailored to accomplish this end. No argument or evidence has been presented that indicates that this interest could not be achieved by permitting private schools themselves to make the determination of whether a new edition contains a significant change. On the contrary, the

record supports the conclusion that the private schools are better qualified to determine whether a change in an edition is significant because, unlike DACO, the private schools have expertise in pedagogical methods and the substantive academic fields under review, and are well acquainted with their institution's unique educational mission, philosophy, and methodology. Further, there is no indication in the record that Rule 11's requirement that parents have the option of purchasing an old edition of a textbook if the new edition does not contain a substantial change is necessary to effectuate DACO's interest to provide consumers with information. ..

DACO's second goal for Regulation 6458 is to protect consumers from the arbitrary or abusive use of new editions of textbooks that only contain cosmetic changes.[26] The record in this case is entirely devoid of any evidence which suggests that the prices of textbooks are excessive, or that textbook publishers' or distributors' pricing, marketing, or other practices are in any way abusive, unfair, or arbitrary. Defendant's only argument proffered in support of its allegation of abuse and unfairness is the fact that textbook production and distribution is a for-profit industry. This, without more, cannot offend notions of justice in our free-enterprise system. Further, it appears that Regulation 6458 was promulgated without any investigation, hearings, consultation with education experts, evidence, findings, or any other foundation which demonstrated that textbook publishers' or distributors prices or practices are abusive, unfair, or arbitrary. It also appears that DACO had no legitimate basis to conclude that consumers would prospectively become at risk of such exploitation by the textbook industry.

However, irrespective of the lack of evidence to support DACO's purported interest or the promulgation of the Regulation, the Court finds that defendant has failed to meet his burden to establish that the Regulation is narrowly tailored to meet its interest. *See Casey,* 308 F.3d at 110 (quoting *Ward,* 491 U.S. at 791, 109 S.Ct. 2746); *Fox,* 492 U.S. at 480, 109 S.Ct. 3028. The provisions of Rule 11 are substantially broader than necessary to achieve DACO's interest to protect consumers from the use or purchase of new editions of textbooks that contain only cosmetic changes. *See Bl(a)ck Tea Sc'y,* 378 F.3d at 12 (quoting *Ward,* 491 U.S. at 791, 109 S.Ct. 2746). The obligations imposed by Rule 11 are not confined to instances when a new edition of a textbook contains only cosmetic changes. Rather, Rule 11 is implicated and imposes burdens on private schools in a variety of instances when the changes in the new edition are not cosmetic, such as the exclusion of chapters or sections; addition of one or several sentences to a chapter, section or throughout a book; and the addition of one or several drawings, graphics, tables, or photographs. *See* Reg. 6458, R.4(A).

Moreover, by allowing parents or guardians to purchase the old edition of a textbook when a change between editions is deemed "not significant" under the definition contained in the Regulation, Rule 11 may impede or prevent private schools from teaching the subject matter contained in the new edition of the textbook, particularly if said information is not available elsewhere or for reproduction. As such,

---

**26.** "The Regulation is intended to control the arbitrary use of reviewed [sic] editions that only contain cosmetic changes at the expense of Puerto Rican citizen [sic]." Defendant's pretrial brief, docket no. 51, at 8 ¶ 4.2.

"D.A.C.O. intends to protect the best interest of the consumers against the economical abusive interests of the textbook publishers and distributors." *Id.* at ¶ 2.10.

the Court finds that the Regulation does not leave open ample alternative channels for communication by private schools to its students of the information contained in the new edition of textbooks. *See Ward,* 491 U.S. at 791, 109 S.Ct. 2746; *Clark,* 468 U.S. at 293, 104 S.Ct. 3065 (The government may impose reasonable restrictions on the time, place, or manner of speech only proved that the restrictions "leave open ample alternative channels for communication of the information.").

In conclusion, the restrictions imposed on plaintiffs' speech and academic freedom by Rule 11 of Regulation 6458 are not narrowly tailored to serve DACO's purported interests and do not leave open ample alternative channels for communication for the information restricted by the Regulation. Therefore, Rule 11 of Regulation 6458 does not survive intermediate scrutiny and is unconstitutional. *See Watchtower Bible, Tract Soc'y of New York, Inc. v. Village of Stratton,* 536 U.S. 150, 177, 122 S.Ct. 2080, 153 L.Ed.2d 205 (quoting *Ward,* 491 U.S. at 791, 109 S.Ct. 2746) (quoting *Clark,* 468 U.S. at 293, 104 S.Ct. 3065).

## II.

### Law No. 116

The Commonwealth of Puerto Rico's Law 116, entitled Law for the Acquisition of School Textbooks (*"Ley para la Compra de Libros de Textos Escolares"*) was enacted on May 18, 2004. Law 116 was enacted "with the purpose of providing that all private schools authorized to oper-

ate in the Commonwealth of Puerto Rico must count [sic] with the consent of the Association, Council of Teachers and Parents, or an Assembly of Parents to determine the maximum budget applicable to each grade for the acquisition of textbooks required in each school year." *See* Law 116, prmbl. Law 116 provides that "[e]very private school accredited by the General Council of Education that requires the acquisition of school textbooks to their students shall have the consent of the Association or Council of Parents or of an Assembly of Parents to determine the maximum budget applicable for each school grade for the acquisition of said books required in each school year." [27] *Id.,* Art. III. Law 116 provides that said goal shall be executed through the holding of an assembly held by the Association or Council of Parents and Teachers or Assembly of Parents not later than May 1st of each school year. During said assembly "the private school shall recommend to the Association or to the Council of Parents and Teachers the budget applicable to each grade for the acquisition of textbooks" for the following school year. *Id.,* Art. 5. "[S]aid association shall approve jointly with the school the same." *Id.* "The maximum budget approved applicable to each grade for the acquisition of textbooks required in every school year shall be obligatory for each private school." *Id.,* Art. 6. However, an exception exists for any textbook or other book with religious content. *Id.*[28] The parties agree that under Law 116, although the

**27.** Law 116 defines "Association of Council of Parents and Teachers" to mean "groups of parents and teachers belonging to authorized private school to operate in the Commonwealth of Puerto Rico." Law 116, Art. II(a). "School textbooks" are defined as "every text, dictionary, reference textbooks, handbook, pamphlet or material for study required or suggested by any private school for the use of

the academic or curricular program." Law 116, Art. II(c).

**28.** "Nothing provided by this law authorizes the Association, Council or Assembly of Parents to limit or interfere in any manner in regard to regard to [sic] textbooks or books with religious context [sic]." Law 116, Art. 6.

private school and its teachers can counsel parents concerning the maximum textbook budget for each grade, parents have veto power over the budget.

Plaintiffs claim that Law 116 violates their First Amendment rights to free speech and academic freedom because it severely limits private schools' freedom to decide what to teach and the manner that their curriculum is taught in their schools. Plaintiffs allege that Law 116 deprives private schools of their autonomy, independence, and academic freedom and power to determine the amount, kind, and quality of the books that the school selects for use in their school, while simultaneously placing this power in the hands of parents who lack expertise in education and pedagogy. Plaintiffs argue that Law 116 dispossesses private schools of the ability to select books which are aligned with the private school's particular educational philosophy, mission, and methodology because parents could refuse to approve a budget sufficient for the purchase of the schools' selected books. Plaintiffs argue that if parents do not approve the school's textbook budget, the school may ultimately be unable to achieve their academic goals to educate their students in a manner consistent with the school's philosophy.

The Court finds that Law 116 imposes restraints on private schools' academic freedom and speech. Here, perhaps even more than in reference to Regulation 6458, the Court has reason to "wonder[ ] why the state should interject itself into this aspect of a purely voluntary relationship inherent in private schooling, one which is merely a facet of choosing to pay for what is otherwise freely provided by the body politic." *Asociacion de Educacion Privada de Puerto Rico, Inc.*, 385 F.3d 81, 88 (Torruella, J., dissenting). Law 116 severely restricts private schools' ability to

determine "what shall be taught and how it shall be taught." *Sweezy*, 354 U.S. at 263, 77 S.Ct. 1203; *Bd. of Regents of Univ. Wisconsin Sys.*, 529 U.S. at 237, 120 S.Ct. 1346. As discussed above, textbooks are the primary pedagogical tool that private schools employ to develop lesson plans and teach their students substantive matter and skills. By allowing parents to effectively dictate to private schools the maximum budget for "every text, dictionary, reference textbook, handbook, pamphlet or material for study required or suggested by any private school for the use of the academic or curricular program," [29] Law 116 interferes with private schools' autonomous decision-making and curtails private schools' academic freedom to pursue their educational objectives without interference from the government. *See Piarowski*, 759 F.2d at 629 (citing *Bakke*, 438 U.S. at 312, 98 S.Ct. 2733); *Ewing*, 474 U.S. at 226 n. 12, 106 S.Ct. 507 (citing *Keyishian*, 385 U.S. at 603, 87 S.Ct. 675); *Sweezy*, 354 U.S. at 262, 77 S.Ct. 1203; *Crowley*, 400 F.3d at 969.

█ Plaintiffs have not specified what standard of review the Court should apply in its analysis of the constitutionality of Law 116. Defendant submits that intermediate scrutiny is appropriate. The Court agrees. Law 116 is not a content-based restriction subject to strict scrutiny because Law 116 does not discriminate on the basis of subject-matter, view-point, or message. *See Simon & Schuster, Inc.*, 502 U.S. at 116, 112 S.Ct. 501 (quoting *Regan*, 468 U.S. at 648–49, 104 S.Ct. 3262). Rather, Law 116 is content neutral because, despite its incidental effect on speech, the legislation is intended to serve a purpose unrelated to the content of the speech. *See id.* at 122 n.*, 112 S.Ct. 501; *Ward*, 491 U.S. at 791, 109 S.Ct. 2746; *Renton*,

---

**29.** Law 116, Art. II(c) (defining the term "school textbook").

475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29. Content neutral regulations and statutes are subject to intermediate scrutiny. *Bartnicki*, 532 U.S. at 545, 121 S.Ct. 1753. Therefore, Law 116 will survive only if it is narrowly tailored to serve a significant governmental interest and leaves open ample alternative channels of communication. *Ward*, 491 U.S. at 791, 109 S.Ct. 2746; *Watchtower Bible & Tract Soc'y of New York, Inc.*, 536 U.S. at 177, 122 S.Ct. 2080; *Clark*, 468 U.S. at 293, 104 S.Ct. 3065; *Bl(a)ck Tea Sc'y*, 378 F.3d at 12; *Casey*, 308 F.3d at 110.

■ The government's primary interest in enacting Law 116 is to ensure that parents of children attending private school in Puerto Rico have the opportunity to participate in making the determination of the budget for textbooks for their students' private schools. *See* Ex. I, Law 116 (translation), Exposition of Purposes; docket no. 51, at 9–10. Part and portion of this interest is to "protect consumers from having to choose between the cheapest education and the most expensive one." Docket no. 51, at 9–10. The government also purportedly designed Law 116 to protect consumers "from being abused by the bookstores, distributors, and publishing houses with their unjustified high prices in textbooks." *Id.* The Court notes that not a scintilla of evidence was submitted which evinces that the prices of textbooks are excessive or unjustified, or that bookstores, distributors, or publishing houses have engaged in any practice which is abusive to consumers. It also appears that Law 116 was enacted without any evidentiary foundation or basis for concluding that consumers have been subject to, or prospectively will become at risk of, abuse by the textbook industry or unjustifiably high priced textbooks.

Irrespective of the lack of evidence to support the government's interests or en-action of the statute, Law 116 is not narrowly tailored and does not leave open ample alternative methods of communication. Law 116 is not narrowly tailored because the means by which the government has attempted to achieve its interest are substantially broader than necessary. *See Bl(a)ck Tea Sc'y*, 378 F.3d at 12 (quoting *Ward*, 491 U.S. at 791, 109 S.Ct. 2746). First, the government's objective of ensuring that parents have the opportunity to participate in making the determination of the budget for private school textbooks could be achieved without requiring the *consent* of "the Association or Counsel of Parents or of an Assembly of Parents to determine the *maximum* budget" for books and thereby curtailing the First Amendment rights of private schools to teach the books selected for the curriculum. *See* Law 116, Art. 3. In other words, parental veto power is not necessary for the accomplishment of the government's interest in parental participation in the textbook budget process and burdens substantially more speech and academic freedom than necessary to further that interest. *See Turner Broad. Sys., Inc*, 520 U.S. at 185, 117 S.Ct. 1174. (A content-neutral regulation will be sustained under the First Amendment only if it "does not burden substantially more speech than necessary to further those interests."). Second, Law 116 is also more broad than necessary to achieve the government's purported interest in protecting consumers from abuse by bookstores, distributors, and publishing houses and unjustified high textbook prices. Law 116 curtails private school's selection of all textbooks, dictionaries, reference textbooks, handbooks, pamphlets and material for study required or recommended for the use in the academic or curricular program of the school regardless of the existence of abuse by the textbook industry or unjustified high prices.

Finally, even if Law 116 was narrowly tailored to serve a significant governmental interest, Law 116 does not leave open ample alternative channels of communication. As discussed above, Law 116 effectively provides parents with the power to veto any book budget proposed by the school. If parents do not consent to a budget that allows the school to use its selected books, the school may be prevented from teaching the content of those books and employing its chosen teaching methods. This veto power has the effect of a prior censure and effectively eviscerates the private schools' First Amendment right to decide what and how to teach by simply not approving the budget allocated for specific books.

In sum, the restrictions imposed on private schools' academic freedom and speech by Law 116 are not narrowly tailored and do not leave open ample alternative channels for communication, and thus constitute an unconstitutional violation of academic freedom embodied in the First Amendment. Further, the Court finds each of Law 116's substantive provisions to be unconstitutional. Law 116 simply cannot be salvaged by severing the unconstitutional provisions from the rest of the statute. Accordingly, Law 116 is held unconstitutional in its entirety.

## CONCLUSION

For the aforementioned reasons, the Court holds that DACO's Rule 11 of Regulation 6458 and the Commonwealth of Puerto Rico's Law 116 are unconstitutional and in violation of plaintiffs' First Amendment rights. Accordingly, plaintiffs' request for a permanent injunction is granted. Therefore, DACO is hereby enjoined from enforcing Rule 11 of Regulation 6458 and Law 116 against private schools in Puerto Rico. Judgement shall be entered accordingly.

**IT IS SO ORDERED.**